STATE of Arkansas *v.* William OSBORN

CR 77-229                                        566 S.W. 2d 139

Opinion delivered May 30, 1978
(Division I)

*Bill Clinton,* Atty. Gen., by: *Jesse L. Kearney,* Asst. Atty. Gen., for appellant.

*Bill E. Ross,* for appellee.

JOHN A. FOGLEMAN, Justice. Pursuant to Rules 16.2 (d) and 36.10, Rules of Criminal Procedure [Ark. Stat. Ann., Vol. 4A (Repl. 1977)], the state appeals from the granting of appellee's motion to suppress evidence obtained by a warrantless search of the mobile home which was the dwelling of appellee William Osborn. The trial court held that the search was illegal and that the controlled substance (marijuana) seized as a result of the search should be suppressed, along with statements made by Osborn when confronted

with the fruits of the search, as evidence obtained in violation of appellee's constitutional rights. We find no reversible error and affirm.

On July 27, 1977, at approximately 10:45 p.m., Mrs. Iva McKinestry notified the Osceola Police Department, by telephone, that there had been a burglary at the mobile home next door to the McKinestry residence. Officer Nunnery was dispatched to the scene where he found Mr. McKinestry standing beside the Osborn mobile home. Mr. McKinestry advised Nunnery that the burglar (who was known to McKinestry) had come out of the trailer with a sack in his hand, that McKinestry had apprehended the burglar in an attempt to hold him until the police arrived, and that the burglar had broken loose and gone back into the mobile home and then had come back out without the sack and fled the scene. McKinestry's statements to the officer corroborated the information given him when he was dispatched to the scene by radio. Nunnery had called by radio for assistance and Lt. Ramey had been called.

The state contends that the marijuana was lawfully seized as a result of an inadvertent discovery of it in plain view by Officer Nunnery from a position in which he was lawfully entitled to be, or in the course of a lawful activity. The state submits that the merits of this appeal will turn upon the question whether a law enforcement officer investigating a crime at a private residence without a warrant is authorized to enter that residence in order to investigate and secure the crime scene. The state relies solely on Ark. Stat. Ann. § 19-1705 (Repl. 1968) as authority for such an entry by a police officer. That section makes it the duty of a police officer "to suppress all riots, disturbances and breaches of the peace, to pursue and arrest any person fleeing from justice . . ., to apprehend any and all persons in the act of committing any offense against the laws of the State . . ., and at all times to diligently and faithfully enforce such laws, ordinances and regulations for the preservation of good order and the public welfare." Under this statute, says the state, it was the duty of the officer (Nunnery) to immediately and without undue delay secure the crime scene, search for and apprehend any burglary suspects still on the scene, seek out and provide aid for any citizen within the mobile home who may have been assaulted or bound by the burglars and search for further evidence of

the crime. We do not view the issue as being quite so narrow, but as we see it, the evidence does not support this view, unless the evidence, viewed in the light most favorable to the state, is given its strongest probative force. That is not the appropriate approach.

We have never stated our standard for appellate review of the trial court action granting or denying motions to suppress evidence obtained by means of a warrantless search. Although the substantial evidence rule has been followed by this court in nearly every instance of review of any fact finding by a circuit judge, even on questions pertaining to admissibility of evidence, there has been at least one outstanding exception since our decision in *Harris* v. *State*, 244 Ark. 314, 425 S.W. 2d 293, cert. den. 393 U.S. 941, 89 S. Ct. 308, 21 L. Ed. 2d 278. We then decided that we would make an independent determination of the voluntariness of a confession as a basis for its admission into evidence, giving respectful consideration to the findings of the trial judge on the critical issue. This review was crystalized into a standard articulated in *Degler* v. *State*, 257 Ark. 388, 517 S.W. 2d 515 and followed thereafter. See, e.g., *Smith* v. *State*, 259 Ark. 849, 537 S.W. 2d 158. We have also extended it to at least one other situation pertaining to admissibility of evidence. See *Hammers* v. *State*, 261 Ark. 585, 550 S.W. 2d 432.

Pursuant to Degler, we make an independent determination based upon the totality of the circumstances, but will not set aside a trial judge's finding of voluntariness unless it is clearly against the preponderance of the evidence. In this approach, we have given considerable weight to the findings of the trial judge in the resolution of evidentiary conflicts. *Harris* v. *State*, supra. We must defer to the superior position of the trial judge to pass upon the credibility of witnesses. *Whitmore* v. *State*, 263 Ark. 419, 565 S.W. 2d 733 (1978).

The "clearly erroneous" rule (which is equated with the "clearly against the preponderance of the evidence" rule, see *Degler*), governs in many of the federal circuit courts of appeal. See *U.S.* v. *Marzano*, 537 F. 2d 257, 33 ALR Fed. 307 (7 Cir., 1976), cert. den. 429 U.S. 1038, 97 S. Ct. 734, 50 L. Ed. 2d 749; *U.S.* v. *Reynolds*, 511 F. 2d 603 (5 Cir., 1975); *U.S.* v. *Lindsay*, 506 F. 2d 166 (D.C. Cir., 1974); *U.S.* v. *Chase*, 503 F. 2d 571 (9 Cir., 1974), cert. den. 420 U.S. 948, 95 S. Ct.

1332, 43 L. Ed. 2d 427. There is also considerable state case law support for this type of review. See, e.g., *State* v. *Smith*, 379 A. 2d 722 (Me., 1977); *State* v. *Pires,* 55 Wis. 2d 597, 201 N.W. 2d 153 (1972); *People* v. *Terrell,* 77 Mich. App. 676, 259 N.W. 2d 187 (Mich., 1977). See also, *Brooks* v. *U.S.*, 367 A. 2d 1297 (D.C. App., 1976); *People* v. *Slonski,* 40 Ill. App. 3d 319, 352 N.E. 2d 292 (1976); *People* v. *Zynda,* 53 Ill. App. 3d 794, 11 Ill. Dec. 471, 368 N.E. 2d 1079 (1977); *Liptroth* v. *State,* Ala. Cr. App., 335 So. 2d 683, cert. den., Ala. 335 So. 2d 688 (1976), cert. den. 429 U.S. 963, 97 S. Ct. 393, 50 L. Ed. 2d 332.

Since we feel that it is the better approach, and since it involves the same type of questions (often mixed questions of law and fact) that arise with reference to suppression of confessions, and the same placing of the burden of proof, we will review this case, and all those arising hereafter relating to a motion to suppress evidence obtained by a warrantless search, in the same manner we do when voluntariness of a confession is the issue. This is similar to the approach taken in other jurisdictions. See, e.g., *Bies* v. *State,* 76 Wis. 2d 457, 251 N.W. 2d 461 (1977).

There was considerable conflict in the testimony as to what happened after the report of the burglary was received. Nunnery testified that he was the first officer on the scene. Mrs. McKinestry corroborated this testimony and said that it was ten or fifteen minutes before other officers came. Nunnery said that three other officers responded and that all arrived at the scene, separately, but within "seconds" of each other (later he named Officers Cartwright, Barron, Hill and Harris as the officers), and that he was with Mr. and Mrs. McKinestry when they arrived, but he did not recall having seen Mrs. McKinestry when he first arrived at the scene. According to Nunnery, he had already been in the Osborn mobile home before the other officers arrived.

Nunnery or Harris entered the mobile home and conducted a search of "the far bedroom," in which a large quantity of marijuana was found on a plastic bag on the floor, and of a closet, in which more marijuana was found, after one of them had entered, smelled the odor of marijuana recently smoked and then saw about one-half ounce of marijuana on a kitchen table. Nunnery said the closet door was open.

The identity of the officer who first entered the mobile home was not established with any degree of certainty. Nunnery testified that, upon arrival and before any other officer entered the mobile home, he went in cautiously through the unlocked but closed front door, with his pistol drawn, saw smoke, smelled a strong odor of marijuana, saw the bag containing less than an ounce of marijuana on the table and inspected the structure, finding what he estimated to be one-half pound of marijuana in the bedroom and more in a bedroom closet, to which the door was open. He stated that the marijuana in the closet was visible to anyone who might be looking in the closet. He said that he also found some marijuana in a kitchen drawer. Nunnery testified that he entered the mobile home with Mr. McKinestry following right behind him, prior to the arrival of Harris and that Harris had entered while he was inside the trailer. According to Nunnery, the smoke or haze that he observed when he first entered the place indicated to him that marijuana had been smoked just moments before.

Officer Rayburn Harris testified that he was talking to Mr. and Mrs. McKinestry at the scene of the burglary when Officers Nunnery and Barron arrived a few minutes later. He said that Nunnery went into the trailer, came back and called Barron, saying that he had found some contraband.

Mrs. McKinestry, a witness on behalf of the state, testified that she and her husband were alerted to the burglary by hearing glass breaking and that her husband locked the door to the Osborn home from the outside by reaching through the broken glass in the door before the police came. She said that when the officers arrived, Nunnery was walking around looking for an address, and had not been inside the mobile home. She added that Harris came up, asked if anyone had been inside, received a negative response, and then stuck his hand inside, opened the door and entered, leaving Nunnery standing by the steps. She said that after Harris had gone through Osborn's place turning on the lights, he came back, called Nunnery, and said something. She testified that neither officer had a pistol "pulled" at any time. She said that she had talked to both Nunnery and Harris at the burglary scene. She also stated that her hus-

band had followed Nunnery into the Osborn mobile home, but that Officer Cartwright had run him out of it.

Nunnery testified that his purpose for entering the Osborn place was to see if there were any other burglary suspects inside, but admitted that on his arrest report he had stated that his purpose was to see if anything had been taken and that he had testified, in a preliminary hearing, that this was his purpose. He explained the inconsistency by saying that he considered the arrest report unofficial and a mere statement of the reasons for Osborn's arrest. He saw no need to go into great detail or to indicate that he was looking for other suspects.

Nunnery admitted that he had no reason to suspect there was contraband in the residence when he entered it. He admitted that the door to the place was closed when he entered; that when he entered, no drawers were pulled out, so he would have had no means of knowing whether anything had been taken; that no attempt had been made to get a search warrant; that he had never investigated a burglary before; that neither of the McKinestrys told him that anyone else was in the Osborn home; that Mr. McKinestry identified the burglar; that he got the impression from his conversation with McKinestry upon arrival at the scene that the occupant of the place was not at home, and had not been during that evening; that he found no one in the place that created any hazard that the substance he took to be marijuana would be taken away, or that it would disappear within the period of approximately one-half hour during which a search warrant could have been obtained. His only excuse for not obtaining a search warrant, after he had seen contraband, was that it would be a waste of motion.

The trial court stated that, since the officers were not making or attempting to make an arrest, and that there was no emergency after the officer's original entry into the mobile home, and no reason to believe that any contraband in the place would disappear while a search warrant was being obtained, the seizure was unconstitutional.

Upon the conflicting testimony, we cannot say that the trial court's finding was erroneous. The trial judge had the

right to believe from this testimony, and he obviously did believe, that the legitimacy of the purpose of the original entry of the officers was not adequately established, and that after the observations made by the officer who first entered, the search of the other rooms was devoted solely to the discovery of controlled substances, that none of the marijuana, with the exception of the small quantity found in the room originally entered was discovered inadvertently, and that there was no exigency that made obtaining a search warrant impracticable. Five police officers seem to have been present at the time. A police lieutenant was consulted by Nunnery after the contraband was found. No reason was shown why some of the officers could not have maintained the security necessary to prevent entry into or exit from the home during the 30 minutes Nunnery needed to obtain a search warrant. Officer Cartwright was left at the scene after the marijuana was removed. Mrs. McKinestry testified that four officers participated in the arrest of Osborn when he came home. This was about three hours after the search. The trial judge was faced with a situation somewhat similar to that prevailing in *Freeman* v. *State,* 258 Ark. 617, 527 S.W. 2d 909.

The judgment is affirmed.

We agree: HARRIS, C.J., and GEORGE ROSE SMITH and HOLT, JJ.